UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

| | |
|---|---|
| JERRY MENDEZ SALAZAR,<br><br>                               Petitioner,<br><br>    vs.<br><br>JAMES A. YATES,<br><br>                              Respondent. | Civil No.      1:06cv1777 IEG (JMA)<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**<br><br>**ORDER GRANTING IN PART, DENYING PART, CERTIFICATE OF APPEALABILITY** |

## I.  INTRODUCTION

Jerry Mendez Salazar, a state prisoner proceeding pro se has filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 challenging his convictions for first degree murder in violation of California Penal Code section 187(a)[1]; first degree attempted murder in violation of sections 664 and 187(a); and for being a felon in possession of a firearm in violation of section 12021.1(a) [doc. no. 1]. Salazar contends: (1) prejudicial admission of a prior crime deprived him of a fair trial; (2) he was denied his Sixth Amendment right to have the jury, not the judge, find facts in support of sentence enhancements; and (3) 28 U.S.C. section 2244 is unconstitutional. The Court has reviewed the Petition, Respondent's Answer ("Resp.'s Mem."), Traverse, request for an evidentiary hearing, and all supporting documents. After a thorough review of the record, the Court finds Salazar

---

[1] All references to sections will be to the California Penal Code unless otherwise noted.

is not entitled to the relief requested and orders that the Petition and request for an evidentiary hearing be **DENIED**.

## II.  FACTUAL BACKGROUND

This Court gives deference to state court findings of fact and presumes them to be correct. 28 U.S.C. § 2254(e)(1) (2006); *see also Parke v. Raley*, 506 U.S. 20, 35-36 (1992) (holding findings of historical fact, including inferences properly drawn from such facts, are entitled to statutory presumption of correctness). The facts as found by the Court of Appeal are as follows:

> During the early morning hours of Sunday, December 22, 2002, a melee occurred among a large group of people congregated on 19th Street, between Eye and Chester Streets, in Bakersfield. There are several bars and clubs in the area, including Studio One, The Bull Pen, Café Sober, and Riley's Bar. Four individuals present were shot, one fatally. Appellant was positively identified as the gunman by a number of percipient witnesses in two of those shootings. Appellant was charged in the other two shootings, but was acquitted. Witnesses described the events as follows.
>
> According to Nicholas Jennings, his friend Brandon Hodge was fighting with a Hispanic male when the appellant exited The Bull Pen and hit Hodge. Jennings in turn hit appellant, who then pulled out a small handgun and fired at Jennings three times. One bullet hit Hodge, who was lying on the ground. Hodge died of a head wound. Jennings identified appellant as the shooter, both in a photo lineup approximately one month after the incident and in court.
>
> Lemuel Chaney testified that he was in front of The Bull Pen and Café Sober, sometime between midnight and 1:30 a.m., when he saw on the ground a Black man, who appeared to be unconscious, being kicked and stomped by a group of Hispanics. Chaney heard two shots and then saw appellant bend over and shoot the unconscious man in the head with a chrome or silver pistol. Appellant put the gun in his pocket and ran past Chaney toward Eye and 19th Streets. Chaney then heard two more shots that sounded like they came from the corner of 19th and Eye.
>
> Chaney described the shooter to two officers at the scene as a Hispanic male, 30 to 40 years old, five feet seven inches to five feet nine inches tall, 140 to 150 pounds, black hair, Fu Manchu mustache, possible goatee, dark-colored jeans, and a light blue sweater with dark blue stripes down each sleeve. Later, at the police station, Chaney viewed a group of six individuals, in which appellant was not included. Chaney recognized several from being at the fight but did not see the shooter. Chaney identified appellant as the shooter from a photo lineup a week after the incident and in court.
>
> Michael Brooks testified he was in The Bull Pen until closing time at 1:30 a.m. He was in the alley behind the bar when he heard shots fired and saw people running. Toward the street, Brooks saw an individual with a gun run up to a Black male on the ground and say, "[D]o you want to die mother fucker, do you want to die?" The gunman

pulled the trigger of a small chrome pistol. Then the gunman ran down the street and repeated the threat to another Black male and shot him as well. At first Brooks tentatively identified someone other than the appellant as the shooter. Later he identified appellant as the shooter in a photo lineup and subsequently in court.

David Duncan testified that he and his girlfriend left Riley's Bar about 1:30 a.m. They saw a fight in progress between "some Hispanics and one white male" and decided to leave the area. As they drove south on Eye Street, Duncan heard gunshots and saw a Hispanic male holding a chrome handgun while standing over a Black male who was curled up in a ball on the ground. The gunman was cursing and the man on the ground was screaming for help. Duncan saw the man with the gun run from the scene.

The afternoon following the incident, Duncan described the gunman to Detective Robert Heiduk as "a Hispanic male, 27 to 28, five-eleven, 175-180 pounds, black, short, buzzed hair, gray sweatshirt and dark-colored pants," holding a "[c]hrome handgun." Duncan positively identified appellant as the gunman from a photo lineup a month after the incident and in court.

The night of the incident, Tim Ellington, a doorman at The Bull Pen, seized the identification of a minor trying to enter the bar because the photo on the identification clearly depicted someone other than the minor. The minor was with an older companion. Ellington identified the companion and the person in the identification photo as appellant. Less than an hour after turning the minor away, Ellington heard shots fired outside and saw a person who looked like appellant holding a handgun. Ellington saw no one else that night who was armed. Ellington identified appellant as the gunman from a photo lineup a month after the incident.

Jason Bravo was celebrating his 21st birthday at Riley's Bar that night with a friend. Bravo testified that he left the bar just before closing. Outside he saw many people on the street and heard some shots fired. Bravo ran toward his car, but on the way he came face-to-face with appellant, who was holding a gun. Appellant moved his arm and held a small, chrome handgun toward Bravo. Bravo was shot in the neck as he ran. Further from the scene, Bravo saw two Black males on the ground. One man was not moving.

Bravo was interviewed in the hospital after the incident. At that time he described his assailant to a detective as a "Hispanic male, 30, five-seven, stocky build, approximately 160 to 170 pounds, combed-back hair, Fu Manchu mustache, wearing a light-gray sweatshirt and dark-colored pants possibly made of jean material." In a photo lineup a week after the incident, Bravo thought appellant "look[ed] like" the person who shot him, but he was not certain. At trial, Bravo identified appellant as the shooter.

¶ Appellant was booked three weeks after the incident. Information gathered at that time described him as five feet eight inches tall with shoes on. At the time of booking, appellant had a shaved head and did not have a mustache. Appellant was wearing a long-sleeved

> gray sweatshirt or sweater with dark blue stripes across the chest and biceps. Appellant's clothing was seized because it "appeared to match the clothing that the suspect wore the night of the incident."
>
> Appellant's cousin testified that she and appellant went to the The Bull Pen that night, and they left a little after 1:00 a.m. for another party. She denied they were involved in any fights.

(Pet., Exhibit ("Exh.") B at 2-5.)

### III.   PROCEDURAL BACKGROUND

On September 28, 2004, a jury found Salazar guilty of first degree murder (with personal use and discharge of a firearm), first degree attempted murder (with personal use and discharge of a firearm, and personal infliction of great bodily injury), and of being a felon in possession of a firearm. (Resp.'s Mem., Exh. A, Abstract of Judgment.)  Salazar was acquitted of two other shootings. (Lodgement No. 1, vol. 7 at 1384-88.) On October 27, 2004, the trial court found true that Salazar had suffered a prior strike, a prior serious felony conviction, and that he had served three prior prison terms. (*Id*. at 1392-95.)  The court sentenced Salazar to a determinate term of 48 years, plus an indeterminate term of 75 years to life. (Resp.'s Mem., Exh. A, Abstract of Judgment.)

Salazar filed an appeal in the Fifth Appellate District Court of Appeal. (Pet. Exh. B.)  On September 15, 2005, the Court of Appeal affirmed the trial court with minor modifications to the one-year enhancements for prior prison terms. (*Id.*) On November 30, 2005, Salazar's subsequent petition for review was summarily denied by the California Supreme Court. (Pet., Exh. A.)

On December 8, 2006, Salazar filed the current Petition for Writ of Habeas Corpus in the United States District Court for the Eastern District of California [doc. no. 1]. Respondent filed an Answer on March 20, 2008 [doc.no. 17]. On May 19, 2008, Salazar filed a Traverse and request for evidentiary hearing [doc.no. 22].

On November 25, 2008, this case was reassigned to the Honorable Irma E. Gonzalez, Chief Judge of the United States District Court for the Southern District of California [doc. no. 23].

### IV.   SCOPE OF REVIEW

This Petition is governed by Title 28, United States Code, § 2254, as amended by the 1996 Antiterrorism and Effective Death Penalty Act ("AEDPA"). Section 2254(a) sets forth the following scope of review for federal habeas corpus claims:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in *violation of the Constitution or laws or treaties of the United States.*

28 U.S.C. § 2254(a) (2006) (emphasis added). As amended, 28 U.S.C. § 2254(d) reads:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was *adjudicated on the merits* in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2) (2006) (emphasis added).

"AEDPA establishes a 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.'" *Womack v. Del Papa*, 497 F. 3d 998, 1001 (9th Cir. 2007) quoting *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002). To obtain federal habeas relief, Ramirez must satisfy either § 2254(d)(1) or § 2254(d)(2). *See Williams v. Taylor*, 529 U.S. 362, 403 (2000). The Supreme Court interprets § 2254(d)(1) as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams*, 529 U.S. at 412-13; *see also Lockyer v. Andrade*, 538 U.S. 63, 73-74 (2003).

Where there is no reasoned decision from the state's highest court, the Court "looks through" to the underlying appellate court decision. *Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991). If the dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law. *See Delgado v. Lewis*, 223

F.3d 976, 982 (9th Cir. 2000) (overruled on other grounds by *Lockyer*, 538 U.S. at 75-76); *accord Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). However, a state court need not cite Supreme Court precedent when resolving a habeas corpus claim. *Early v. Packer*, 537 U.S. 3, 8 (2002). "[S]o long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent,]" *id.*, the state court decision will not be "contrary to" clearly established federal law. *Id.*

## V. ADMISSION OF PRIOR CRIME

At Salazar's trial, the jury heard evidence of a 1992 incident in which Salazar stabbed a young male in the street while a group of other Hispanic males held the victim. (Lodgement No. 1, vol. 5 at 817-19, 837-38.) The incident took place in the same vicinity as the shootings in this trial. (*Id*. at 814, 837.) Salazar contends the evidence was not probative of motive or intent, was unduly prejudicial, and deprived him of a fair trial and due process pursuant to the Fourteenth Amendment. (Pet. at 9.)

The State Supreme Court summarily denied this claim, thus the last reasoned state court decision was issued by the Court of Appeal. (Pet., Exh. B.), *Ylst*, 501 U.S. at 801-06. While the court described the issue as a "close case," it ultimately did not find an abuse of discretion by the trial court. The Court of Appeal stated:

> The two incidents are not so similar as to be signature crimes admissible for the purpose of proving identity. [] However, they do bear similarities which could support a rational inference of motive or intent. Each was preceded by a street melee, each involved little or no provocation toward the appellant and, in each, appellant's response was a vicious assault with a deadly weapon.

(Pet., Exh. B at 6.) The court further noted that even if the trial court had erred in admitting this testimony, Salazar was not prejudiced by the evidence. The court stated the jury's acquittal of Salazar on two other crimes where the eyewitness identification was questionable, indicated the prior crime evidence could not have been unduly prejudicial. (*Id*. at 8-9.)

According to clearly established federal law, state evidentiary rulings are not cognizable in federal habeas proceedings unless the admission of evidence violated the petitioner's due process right to a fair trial. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("federal habeas relief does not lie for errors of state law," such as improper admission of prior act evidence unless there is a violation of petitioner's constitutional rights). To establish a due process violation, Salazar must show that the trial court's ruling was so prejudicial that it rendered his trial fundamentally unfair. *Ortiz-Sandoval v. Gomez*,

81 F.3d 891, 897 (9th Cir. 1996). The Court must first determine whether the contested evidence was relevant to an essential element in the case, or whether it was improper character evidence used only to show petitioner's propensity for violence. *McKinney v. Rees,* 993 F.2d 1378, 1380-81 (9th Cir. 1993).

The murder statute under which Salazar was convicted, section 187(a), states "Murder is the unlawful killing of a human being . . . with malice aforethought." Malice aforethought encompasses intent to kill or "knowledge of the danger to, and with conscious disregard for, human life." *People v. Jeter*, 125 Cal.App.4th 1212, 1216 (2005) (internal quotation omitted). Additionally, section 189 categorizes murder in degrees and describes first degree murder as "deliberate and premeditated." CAL. PEN.CODE § 189. Premeditation is the essential element that distinguishes first degree from second degree murder and encompasses "*actual* forethought and deliberation." *See People v. Whisenhut*, 44 Cal.4th 174, 201 (2008). Thus, intent, premeditation, and deliberation are all elements of first degree murder. *People v. Wright,* 39 Cal.3d 576, 589 (1985).

Although motive is not an element of first degree murder it can be relevant in showing specific intent to kill and premeditation. *United States v. Brown*, 880 F.2d 1012, 1015 (9th Cir. 1989); *Brown v. Borg*, 951 F.2d 1011, 1016 (9th Cir. 1991). Evidence of a similar, prior criminal act is admissible to show intent or motive only if the prior act was "sufficiently similar [to the charged offenses] to support the inference that the defendant probably harbored the same intent in each instance." *People v. Lewis,* 25 Cal.4th 610, 637 (2001) (internal quotations and citations omitted). This standard is lower than the level of similarity required for a prior act to be admissible to prove identity or common design or plan. *Id*. at 636-637 ("To be relevant on the issue of identity, the uncharged crimes must be highly similar to the charged offenses . . .. [¶] . . . [¶] A lesser degree of similarity is required to establish relevance on the issue of common design or plan . . .. [¶] The least degree of similarity is required to establish relevance on the issue of intent.") (internal quotations and citations omitted). Although Salazar's previous stabbing incident and the current shootings are not "particularly distinctive," they do meet the "sufficiently similar" basis for admission to show intent or motive. *Id*. at 638. Both crimes involved vicious, unprovoked attacks, using a deadly weapon, on individuals during street melees in the same vicinity.

Moreover, the jury acquitted Salazar of two other crimes for which the identification was questionable. (Lodgement No. 1, vol. 7 at 1384-88.) This implies the presence of the prior act evidence did not have as much influence on the jury's decision as the eyewitness identification testimony. Further, assuming the evidence was inadmissible, the trial court's limiting instruction to the jury to use the evidence only for the purpose of showing motive and intent, and not for proof "that defendant is a person of bad character or that he has a disposition to commit crimes," served to limit any prejudicial impact. *Lewis*, 25 Cal.4th 610 at 637; (Lodgement No. 1, vol 6 at 1219). The law assumes that jurors follow their instructions. *Richardson v. Marsh,* 481 U.S. 200, 206 (1987).

In his Traverse, Salazar alludes, for the first time, to the inadequacy and unreliability of eyewitness identification evidence in general, and the evidence offered at his trial in particular. (Traverse at 5.) However, "[a] Traverse is not the proper pleading to raise additional grounds for relief." *Cacoperda v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994). Additional claims must be raised in an amended petition or in a statement of additional grounds to properly advise the state of those claims. *Id.* Furthermore, Salazar's claim lacks specificity. For example, he does not state if the identification procedure was improperly suggestive or that he was denied presentation of expert testimony showing eyewitness testimony is generally unreliable. *See United States v. Amador-Galvan*, 9 F.3d 1414, 1417-18 (1993)(expert testimony that is trustworthy and scientifically valid may be introduced to show unreliability of eyewitness testimony); *Van Pilon v. Reed*, 799 F.2d 1332, 1338 (9th Cir.1986) (in-court identification testimony not admissible if tainted by pretrial identification procedure that was impermissibly suggestive). Thus, Salazar has failed to present a cognizable claim with regard to the validity of eyewitness identification during his trial.

In any event, the likelihood of prejudice, due to the identifications, was limited by the jury instruction on eyewitness testimony that cautioned the jury to consider, among other things, the following factors affecting the weight to be given to eyewitness identification: cross-racial identification, time of identification, believability of the eyewitness, opportunity to observe the crime and perpetrator, ability to provide a description or identify the alleged perpetrator from a line-up, whether the witness had prior contacts with the alleged perpetrator and whether the identification was a result of the witness's own recollection. (Lodgement No. 1, vol. 6 at 1225-26.) The Court must again

1  presume the jury followed this instruction.  *Watkins v. Sowders*, 449 U.S. 341, 347 (1981) ("[w]here
2  identification evidence is at issue [] no special considerations justify a departure from the presumption
3  that juries will follow instructions.").  Defense counsel was able to cross-examine the identification
4  witnesses, and argued the factors that raised doubt about the accuracy of the identification, but it was
5  ultimately the job of the jury to assess the reliability of the eyewitness evidence.  *Id.*  The jury clearly
6  resolved this issue against Salazar.

7  In conclusion, the prior stabbing was relevant to the intent element of the murder charges and
8  its admission was not so prejudicial that it rendered Salazar's trial fundamentally unfair.  The state court
9  decision was not contrary to or an unreasonable application of clearly established federal law.  *Williams*,
10 529 U.S. at 412-13.  Salazar's claim is **DENIED**.

## VI. SIXTH AMENDMENT RIGHT TO JURY TRIAL

12  Salazar was convicted and sentenced for being a felon in possession of a firearm.  (Resp.'s
13 Mem., Exh. A, Abstract of Judgment.)  His claims in this section rest upon the enhancements imposed
14 on his murder and attempted murder sentences under section 12022.53 [2] for discharge of the *same*
15 firearm.  (Pet. at 10-12.)  First, Salazar asserts the trial court violated section 654, which he contends
16 disallows double punishment for both possession and discharge of the same firearm.  (*Id.*)  Second, he
17 argues the trial court violated his Sixth Amendment right to have a jury, not the judge, find separate
18 facts in support of discharge of the firearm, distinct from intent to possess the firearm, to support
19 imposition of the enhancements.  (*Id.*)

20 The Court notes that "[s]ection 654 is not a mandate of constitutional law." *People v. Cleveland,*
21 87 Cal.App.4th 263, 270-71 (2001).  This section applies when "a course of conduct which...constitutes
22 an indivisible transaction" is punishable under different laws.  *People v. Saffle*, 4 Cal.App.4th 434, 438

---

[2] California Penal Code section 12022.53 (c) states, "Notwithstanding any other provision of the law, any person who, in the commission of [murder or attempted murder]... intentionally discharges a firearm, shall be punished by an additional and consecutive term of imprisonment in the state prison for 20 years." Subsection (d) states, "Notwithstanding any other provision of the law, any person who in the commission of [murder or attempted murder]...intentionally discharges a firearm and proximately causes great bodily injury...or death...shall be punished by an additional and consecutive term of imprisonment in the state prison for 25 years to life." Salazar was sentenced to one 25-year enhancement under subsection (d) and one 20-year enhancement under subsection (c).

1  (1992).  The conduct or act should then be punished under the provision which contains the longest
2  prison term and "in no case shall the act [] be punished under more than one provision." CAL. PEN. CODE
3  § 654.  Thus, the section is a "discretionary benefit," *Cleveland*, 87 Cal.App.4th at 270-71, applicable
4  by the state sentencing court, and as such, its misapplication does not justify federal habeas relief unless
5  Salazar can demonstrate he suffered fundamental unfairness. *Christian v. Rhode*, 41 F.3d 461, 469 (9th
6  Cir. 1994) (state court's misapplication of its own sentencing laws not a basis for federal habeas relief);
7  *see also Estelle,* 502 U.S. at 68 (1991) ("In conducting habeas review, a federal court is limited to
8  deciding whether a conviction violated the Constitution, laws or treaties of the United States.").  To the
9  extent Salazar seeks relief for the state court's errors in applying its own law, he is not entitled to such
10 relief.

11      The Court also concludes that Salazar did not suffer fundamental unfairness when the state court
12 sentenced him separately for each enhancement.  In rejecting Salazar's section 654 claim, the Court of
13 Appeal explained its reasoning thus:

> [T]he evidence in the present case established that appellant possessed the weapon prior to the murder of Hodge and the attempted murder of Bravo.  Jennings testified that appellant "pulled out" a handgun and shot toward him, hitting Hodge instead.  Chaney saw appellant, after shooting Hodge, put the gun in his pocket and run down the street.  Chaney then heard several other shots fired.  Because a witness saw appellant "pull out" a handgun, presumably from his pocket or waistband, appellant necessarily had possession of the weapon for a period of time prior to the murder.  Because a witness saw him put the gun in his pocket after the murder, appellant also had possession of the weapon for a period of time before the attempted murder.
>
> ¶ Appellant's intent to possess the gun was thus separate and distinct from his additional intent to kill Hodge and his attempt to kill Bravo.

22 (Pet., Exh. B at 11-12.)  The Court of Appeal cited *People v. Radcliff*, 223 Cal.App.3d 1401, 1414
23 (1990) which held "[c]ommission of a crime under section 12021 [felon in possession of a firearm] is
24 complete once the intent to possess is perfected by possession.  What the ex-felon does with the weapon
25 later is another separate and distinct transaction undertaken with an additional intent which necessarily
26 is something more than the mere intent to possess the proscribed weapon."

27      California cases considering whether possession of a firearm may be punished separately from
28 the use of the same firearm have focused on the facts of each individual case, and whether the evidence

reflects possession distinctly from use in the primary offense, or possession only in conjunction with the primary offense. *See People v. Jones*, 103 Cal.App.4th 1139, 1141 (2002) (when ex-felon arrives at scene already in possession of firearm one can reasonably infer possession is the separate and antecedent offense*); People v. Venegas*, 10 Cal.App.3d 814, 821 (1970) (section 654 barred separate punishment where defendant possessed gun only at time of shooting and only with one objective, that is, to shoot the victim); *People v. Bradford*, 17 Cal.3d 8, 13 (1976) (section 654 barred imposition of separate punishment where defendant wrested gun away from officer to shoot officer). Under state law then, the intent to possess a firearm and the intent to use or discharge that firearm are actions divisible under the facts of this case. Thus, in the absence of "an indivisible transaction," the Court of Appeal correctly held that section 654 did not apply.

Moreover, recently in *People v. Palacios*, 41 Cal.4th 720, 730 (2007) the California Supreme Court held that section 12022.53's use of the "[n]otwithstanding any other provision of law" language [*see* fn. 1], without expressly exempting section 654, among other things, shows a legislative intent that trial courts should impose the enhancements in section 12022.53 without reference to section 654. *Palacios*, 41 Cal.4th at 730.

Nonetheless, Salazar argues that if the Court accepts possession and discharge of the firearm constituted divisible acts that did not offend section 654 above, the jury should have made separate and independent findings of fact supporting discharge and possession beyond a reasonable doubt pursuant to the Sixth Amendment right to a jury trial. *See* U.S. Const., amend. VI (guarantees "the right to a speedy and public trial, by an impartial jury"). To support this assertion Salazar invokes the *Apprendi* sentencing maxim that, "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000).

From a review of the record, the Court finds that the jury did indeed find discharge of a firearm separately from possession of the firearm. The following are the instructions given to the jury:

> Every person who having previously been convicted of a felony has in his possession or under his custody or control any pistol, revolver, or other firearm is guilty of a violation of [felon in possession of a firearm]. ¶ In order to prove this crime, each of the following elements must be proved: One, the defendant previously convicted of a felony *had*

> *in his possession or had under his control a firearm; and two, the defendant had knowledge of the presence of the firearm.*
>
> \*\*\*
>
> It is alleged [] that the defendant *intentionally and personally discharged a firearm* and caused great bodily injury or death to a person during the commission of the crimes charged. ¶ The word "firearm" includes a handgun. The term *"intentionally and personally discharged a firearm"* as used in this instruction *means that the defendant himself must have intentionally discharged it.*

(Lodgement No. 1, vol. 7 at 1384-87.) (Emphasis added.)[3]

The following are the verdict form findings:

> We, the jury, [] find it to be true that Jerry Mendez Salazar did *personally and intentionally discharge a firearm which proximately caused great bodily injury or death to another person . . .*.
>
> \*\*\*
>
> We, the jury [] find the defendant, Jerry Mendez Salazar, guilty of felony, to wit: *illegal possession* of firearm [by a felon].

(*Id.*) (Emphasis added.)

The jury specifically found personal discharge of the firearm by Salazar to be true under both counts of murder and attempted murder. (*Id.*) Thus, the jury, not the trial court, made separate findings that Salazar intentionally discharged the gun that resulted in the injury to Bravo and the death of Hodge, and that, pursuant to the possession charge, Salazar knowingly possessed the weapon.

The Court concludes: (1) Salazar did not suffer fundamental unfairness, and (2) because Salazar's jury found independent factual grounds for the possession charge, and the enhancements for the murder convictions, Salazar's Sixth Amendment right to a jury trial was not violated. Thus, the state court's rejection of this claim was not contrary to or a misapplication of clearly established federal law. *Williams*, 529 U.S. at 412-13. Salazar's Sixth Amendment claim is **DENIED**.

## VII. CONSTITUTIONALITY OF 28 U.S.C. § 2244

---

[3] California Jury Instruction (CALJIC) 17.19.5 covering imposition of enhancements under Penal Code sections 12022.53 (c) and (d) requires the jury to find the defendant himself "intentionally discharged" a firearm causing great bodily injury or death. CALJIC 12.44 covering felon in possession of a firearm, requires the jury to find "that a person knowingly exercise control" over the weapon.

28 U.S.C. section 2244 imposes certain limitations and requirements for a properly filed habeas petition, such as a one-year limitation for filing an application. 28 U.S.C. § 2244(d)(1). Salazar brings two constitutional challenges against the statute. Because Salazar did not raise these claims in the state court, they are technically unexhausted. However, the Court will not deny this Petition as mixed (containing both exhausted and unexhausted claims) because it is not perfectly clear that Salazar does not raise colorable constitutional claims. *Cassett v. Stewart*, 406 F.3d 614, 623-24 (9th Cir. 2005) (federal courts may deny an unexhausted petition on the merits only when it is clear there is not one colorable federal claim).

Salazar first argues that section 2244 is fundamentally unfair because it requires inmates without legal training to file a habeas petition within the limitations period. (Pet. at 15-16.) While individuals do not have a constitutional right to counsel in seeking state collateral relief or a federal habeas corpus petition, they do have a right to due process. *Bonin v. Vasquez*, 999 F.2d 425, 429 (9th Cir. 1993) (no constitutional right to counsel on habeas); *Coleman v. Thompson*, 501 U.S. 722, 756-57 (1991) (no constitutional right to counsel in pursuing state collateral review of a conviction). However, the absence of counsel by itself does not amount to a due process violation. *Bonin*, 999 F.2d at 429. Thus, Salazar has to demonstrate an independent ground upon which the proceedings violated his due process rights. Salazar has failed to show any due process violations.

Salazar next contends section 2244 is unconstitutional because it violates the Suspension Clause. U.S. CONST. art. I, § 9, cl. 2. ("The privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it."); (Pet. at 16-18). Salazar is correct to note the significant role of the writ of habeas corpus in the jurisprudence of this country's common law, but the United States Supreme Court has long recognized that "the power to award the writ by any of the courts of the United States, must be given by written law," *Ex parte Bollman*, 4 Cranch 75, 94, 2 L.Ed. 554 (1804), and that the proper scope of the writ is normally for Congress to decide. *Lonchar v. Thomas*, 517 U.S. 314, 323 (1996). The Supreme Court has further stated that restrictions placed on the writ by statute protect against the equally historically significant principle of "abuse of writ." *Felker v. Turpin*, 518 U.S. 651, 664 (1996). Thus, the restrictions in section 2244 are also a part of the legal evolutionary process to which Salazar refers, and do not amount to a

suspension of the writ. *Id.; Ferguson v. Palmateer,* 321 F.3d 820, 823 (9th Cir. 2003)

In conclusion, section 2244 does not violate due process or the Suspension Clause and is thus not unconstitutional. The Court of Appeal's denial of Salazar's petition for writ of habeas corpus was not contrary to or an unreasonable application of clearly established federal law. *Williams*, 529 U.S. at 412-13. Salazar's claim is **DENIED**.

## VIII.  EVIDENTIARY HEARING

Salazar has requested an evidentiary hearing and has expressed some frustration about continually having been denied this request in state court. (Pet. at 14-15; Traverse at 6.) The Court will thus fully articulate the basis for its decision to also deny Salazar's request in this court.

Evidentiary hearings in 28 U.S.C. § 2254 cases are governed by AEDPA, which "substantially restricts the district court's discretion to grant an evidentiary hearing." *Baja v. Ducharme*, 187 F.3d 1075, 1077 (9th Cir. 1999). The provisions of 28 U.S.C. § 2254(e)(2) control this decision:

> (2) If the applicant has failed to develop the factual basis of a claim in State Court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that —
>
> (A) the claim relies on —
>
> > (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
> >
> > (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for the constitutional error, no reasonable factfinder would have found the appellant guilty of the underlying offense.

*See* 28 U.S.C. § 2254(e)(2).

The Ninth Circuit has outlined the procedure for district courts to follow in determining whether to grant a request for an evidentiary hearing. First, the Court must "determine whether a factual basis exists in the record to support the petitioner's claim." *Insyxiengmay v. Morgan*, 403 F.3d 657, 669-70 (9th Cir. 2005) (citing *Baja*, 187 F.3d at 1078). If not, the Court must "ascertain whether the petitioner has 'failed to develop the factual basis of the claim in State court.'" *Id.* A failure to develop the factual basis of a claim in state court implies "some lack of diligence, or some greater fault, attributable to the

prisoner or the prisoner's counsel." *See Williams v. Taylor*, 529 U.S. 420, 432 (2000). If the petitioner has failed to develop the factual basis for his claim in state court, "the court must deny a hearing unless the applicant establishes one of the two narrow exceptions set forth in section 2254(e)(2)(A) & (B)." *Insyxiengmay*, 403 F.3d at 669-70.

If, however, the petitioner "has not 'failed to develop' the facts in state court, the district court may proceed to consider whether a hearing is appropriate, or required under *Townsend [v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963)]." *Id.* The Supreme Court has noted that the restraints of AEDPA must be taken into account in this decision:

> In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief. *See, e.g.*, *Mayes v. Gibson*, 210 F.3d 1284, 1287 (C.A. 10 2000). Because the deferential standards prescribed by § 2254 control whether to grant habeas relief, a federal court must take into account those standards in deciding whether an evidentiary hearing is appropriate. *See id.*, at 1287-1288 ("Whether [an applicant's] allegations, if proven, would entitle him to habeas relief is a question governed by [AEDPA]").

*Schriro v. Landigan*, 550 U.S. 465, 474 (2007). Moreover, "[b]ecause a federal court may not independently review the merits of a state court decision without first applying the AEDPA standards, a federal court may not grant an evidentiary hearing without first determining whether the state court's decision was an unreasonable determination of the facts. *Earp v. Ornoski*, 431 F.3d 1158, 1167 (9th Cir. 2005 (citing *Lockyer*, 538 U.S. at 71.)

Having considered the above legal mandates, the Court concludes Salazar is not entitled to an evidentiary hearing. The Court has reviewed seven volumes of transcripts consisting of all the evidence presented at trial. Salazar's claims are, in essence, legal contentions based on the existing factual record and not on new or different facts that are outside of the record. He questions the prejudice caused by *established facts* of the prior crime; he challenges the *legality* of using the same set of *already presented facts* to find him guilty of both possession and discharge of a firearm and whether the law requires the jury to find the existence of those facts; and finally, *regardless of the facts*, he challenges the legal validity of a federal statute. Thus, the existing record provides a sufficient factual basis for the Court to resolve Salazar's claims. *Insyxiengmay*, 403 F.3d at 669-70. Accordingly, Salazar's request is

**DENIED**.

///

## IX.     CONCLUSION

For all the foregoing reasons, **IT IS HEREBY ORDERED** Salazar's Petition for Writ of Habeas Corpus and request for evidentiary hearing is **DENIED** in its entirety, terminating this action.

A Certificate of Appealability ("COA") is required pursuant to 28 U.S.C. § 2253 before a petitioner can pursue an appeal. The Court **GRANTS** Salazar a Certificate of Appealability with regard to the admission of prior crime evidence, the claim in section V. herein. A Certificate of Appealability as to all other claims is **DENIED**.

**IT IS SO ORDERED**.

**DATED:  September 30, 2009**

*[signature]*
**IRMA E. GONZALEZ, Chief Judge**
**United States District Court**